No. 9512.

J. M. SEIXAS, SYNDIC, vs. THE CITIZENS' BANK OF LOUISIANA.

In a revocatory action three things are requisite to maintain it—fraud on the part of the vendor, knowledge on the part of the vendee, and actual injury to the other creditors.

Knowledge may be express or constructive.

As a general rule the knowledge of the agent is the constructive knowledge of the principal.

Where an agent acts in double capacity, as in case a president of a bank contracts on the part of the bank with himself as an individual, or as the representative of a firm of which he is a member, if, in such transaction, the president of the bank is faithful to the interests of the bank, his principal, and his action is favorable to the bank, his knowledge of any material fact bearing on the validity of the contracts, such, for instance, as his own or his firm's insolvency, will be held to be the knowledge of the bank. If, on the contrary, the agent or bank president acts only for his own or his

firm's benefit, regardless of the interests of the bank, his knowledge will be not regarded as the knowledge of the bank.

Section 1808, R. S., strikes with nullity all contracts which an insolvent enters into with intent or purpose to give one creditor a preference over another, if made within three months next preceding his failure. The word "failure" in this statute means judicial failure, or a failure declared by a judgment or order in an insolvent proceeding.

APPEAL from the Civil District Court for the Parish of Orleans. Monroe, J.

### Bayne & Denegre for Plaintiff and Appellee:

The exception by defendant of *lis pendens* was properly overruled by the court. The Tubal Cain, 9 Federal Rep., 836; 7 Wallace, 619; 14 Ann., 383; 3 Sumner, 165; Godfrey vs. Hall, 4 La., 158; 17 La., 480; 6 Mart, N. S., 517; 13 Ann. Rep., p. 233.

The evidence shows that in March, 1884, Carrière & Sons were indebted to the defendant for "over-draft" by themselves and their friends for about $596,380.32, for which they transferred securities exceeding $300,000, and when said transfers were made, they were and had been for a long time hopelessly insolvent. These transfers are in fraud of the rights of their creditors, and will be set aside. Blodget vs. Hogan, 10 Ann., 19; 6 Ann. 552, Pratt vs. Creditors; 5 Robinson, 288; 37 Ann. 510; Black, syndic of Pilsbury, vs. Richardson, 37 Ann., Rep.; 17 Wallace, 487; 2 Wood's Rep., 23.

The bank cannot claim the fruits resulting from an illegal or fraudulent act of their agent and repudiate the knowledge of his insolvency which he had at the time of making the transfers. 9 Federal Reporter, 273; 36 Conn. 100; American Law Register, vol. 10, N. S., p. 572; Bump on Fraudulent Conveyances, 234; 9 Bush, 609; 101 U. S. 328.

The word "failure" in Section 1808 of the Revised Statutes of Louisiana has the significa- tion which is given to it among the definitions in Art. 3556, Sec. 11, of the Civil Code, and the transfers made within three months prior to the 4th or 10th of June are stricken with nullity; C. C. 3556; Sec. 11, Code Napoleon, 457; Kennedy vs. Savings Institu- tion, 36 Ann. 8; 4 Martin, 30; 7 Martin 30; 2 Martin N. S. 64; 5 Martin N. S. 620; 6 Mar- tin N. S. 66; 3 Martin N. S. 29; 26 Ann. Rep. 297; 2 La. 556; 2 Ann. 45; 1 La. 500; 2 La. 82; 23 Ann. 37; 7 Touillier, 381; Mayer vs. Hellman, 91; U. S. 500; 94 U. S. 557; 16 Wallace, 610; Case Beever vs. Citizens' Bank, 2 Woods, 23; 3 Story, 544; 17 Federal Rep., 665.

The knowledge of the president or cashier of the bank of the insolvency of Carrière & Sons when the transfers were made is the knowledge of the bank     Wade on Notice, Secs. 32 and 33. 677, 681, 682 and 683; 36th Conn. Rep., 100, republished in Am. Law Rep. 10, N. S., p. 572, with notes of leading cases; 19 Vermont, 310; 33 Vermont; 10 Bush, 44; 13 La. 526; 14 Ann. 711; 2 Ann. 319; 1 Martin N. S. 367; 36 Conn. 395; 11 Wallace, 366; 38 Iowa, 261; 113 Mass. 391; 121 Mass. 400; 2 Missouri, 282-367; 2 Hill, 451; 96 U. S. 35; 7 Federal Reporter, 340; 101 U. S. 328; Atlantic Reporter, vol. 1, pp. 417-485; 34 Vermont, 262, 112; English Common Law, Rep. 466; Dunlap Paley's Agency, 265, 102, U. S. 263; 19 Wallace, 678, 114, U. S. 561, 96 U. S. 36     It makes no difference if the president or cashier is acting in a double capacity, for himself and the bank, if his acts benefit the bank, and the bank retains the advantages arising from his acts. This is true even where the motive of the debtor was not to give preference, but merely to court the favor of his creditor for future advantage to himself.

An insignificant or trifling legal consideration which might be sufficient to support a con- tract will not suffice to defeat a revocatory action

The transactions disclosed in the record gave a preference to the bank by the insolvent firm of which the president of the bank was a member and the manager. In making these transactions he was not adverse to the bank, and they are not within any excep-

tion which defeats the operation of the general rule that knowledge of the agent is knowledge of the principal.

Under the law of the State, No. 91 of 1877, it was the duty of the president and directors to know and publish "overdrafts," and under the law and the facts disclosed in this case, notice is imputed to them. 1 Johnson, Ch. 261; 2 Hill, 451. The law imputes notice to them of what it requires them to know and to do. Morse on Banks and Banking, p. 101; 1 John, 261, and authorities cited above.

### Henry C. Miller for Defendant and Appellant:

The case presents, besides other issues, the question of fact, whether the defendant, the Citizens' Bank, gave the cash value for certain notes and assets, sued for by plaintiff. The proof shows the bank acquired these notes and assets for its cash loans and cash discounts, obtained by the firm in due course of their account. and on the notes and assets sued for, then pledged or discounted.

The mere fact that the firm of A. Carrière & Sons had an overdrawn account in the Citizens' Bank is no impediment to giving them fresh loans and discounts on collaterals; nor is there any warrant to say, that if such loans and discounts on collaterals are paid to the firm, that the credits for the fresh loans and discounts are to be imputed to the antecedent overdraft, and the bank is to have no title to the collaterals on which it pays out its cash.

When the bank lends money on collaterals, afterwards discounts the collaterals, crediting the debtor in account with the proceeds, and the debtor checks on the account thus credited to take up his notes given for the loan, the discount thus credited and checked upon by the debtor is, in effect, the consummation of the pledges to the bank, and the discount merely applies to the collaterals to the pledged debt. 14 La., p. 321; 9 Ann., p. 539.

The discounts by the bank of pledges acquired for cash paid affords no basis for the revocatory action, although, when the collateral is discounted, the account of the debtor is overdrawn and he is actually insolvent, unless the pledges are of greater value than the loans for which the pledges were acquired. 9 Ann., p. 539; 14 La., p. 321.

By the discount of the note pledged, the pledge is no longer held by the title of pledge, but the discount makes the bank the owner of the note. 3 La. 575; Bouvier Law Dictionary, verbo "Discount."

The knowledge of the agent will not be deemed the knowledge of the principal when it is the interest of the agent to withhold, and he does withhold, his knowledge from his principal. See the authorities cited in the brief.

The pledge for an antecedent debt is a valid pledge, unless the pledgor is insolvent to the knowledge of the pledgee, and the other conditions exist, to sustain the revocatory action. R. S. S. 1808, Acts 1817, p. 131; 11 La., p. 94; 4 Rob. 408; 6 Ann. 93.

The three months next preceding his failure, specified in the 1808th Section of the Revised Statutes, means the three months next preceding the filing of the debtor's petition, praying to be allowed to surrender his property to his creditors. 4 La., p. 256; 15 La., p. 123; Civil Code, Art. 2054; Code of Practice, Art. 165.

### White & Saunders on the same side:

#### I—STATEMENT OF FACTS.

1. Emile Carrière was president of defendant bank until March 12, 1884. From that date till June 9, 1884, Mr. T. D. Miller was acting president. Mr Carrière having withdrawn on account of illness, continued so in name but not in fact. Mr. E. Carrière was also sole managing partner of the firm of A. Carrère & Sons.

2. The firm of A. Carrière & Sons suspended business and went to protest on June 10, 1884. It made a surrender under the insolvent laws of Louisiana, on July 18, 1884.

3. While Mr. Carrière was in fact, as well as in right, president of defendant bank, he permitted his firm to overdraw its account and to borrow the bank's funds to the amount of over $200,000. He also permitted Emile DeSmet, owner of a saw-mill, and M. Escobal, owner of a tobacco factory, to overdraw their accounts and borrow to an amount of several hundred thousand dollars. All these overdrafts and borrowings were secured by pledges of collaterals belonging partly to A. Carrière & Sons, and partly to DeSmet and Escobal.

4. After Mr. Carrière ceased to act as president of the bank, he had several transactions with it, through its then acting president, either borrowing additional money or changing the form of the contracts entered into before March 12, while he still acted as president.

5. The firm of A. Carrière & Sons was enormously insolvent for several years before its suspension.

6. From time to time, A. Carrière & Sons were permitted to withdraw certain of the pledged securities under an agreement to substitute others. The substitutes were partially furnished in the course of a few weeks.

7. The questions of fact arising under the evidence are—

  *a.* Had any officers of the bank, besides Emile Carrière, actual knowledge of the insolvency of A Carrière & Sons?

  *b.* Whose property, at the time of pledging, were the several collaterals held by the bank?

  *c.* Were the transactions during the last year between the bank and A, Carrière & Sons intended by the parties, or by the firm, to be a securing of the existing debt of the firm to the bank, or did the firm simply intend and secure its own benefit?

  *d.* Whether several of the transactions after March 12 were or were not in substance only reproductions without material alterations, save in form, of contracts entered into before that date, and giving the bank all the securities apparently held under the later contracts.

  *e.* Whether, where the contract was in terms and as far as the evidence shows a loan on notes secured by pledge, the Court could consider this a covert securing of the existing overdraft—the evidence further showing that within the five days following the transaction the firm drew out much more than the amount of the loan, and their deposits were several thousand dollars less.

## II—QUESTIONS OF LAW.

1. *Constructive Knowledge.* In contracts between a corporation and one of its officers, acting in his own interest, the corporation is not chargeable with knowledge of facts affecting the transaction known to such officer and not otherwise known to the corporation. *In re* European Bank, 5 Chan. Appeal, 353; Winchester vs. Railroad Co., 4 Md. 231; Barnes vs. Gas Co., 27 N. J. Eq. 33; Wickersham vs. Zinc Co., 18 Kans. 481; Lucas vs. Bank of Darien, 2 Stew. (Ala.) 280; Peckham vs. Hendren, 76 Ind. 47; *In re* Garity vs. Merchants' National Bank, 139 Mass. 332.

2. *Meaning of "Failure," in* § 1808 *of Revised Statutes of Louisiana.* The three months mentioned in § 1808, R. S., count back from the day of the filing of insolvency proceedings in court, and *not* from the time of actual insolvency, suspension of business, or going to protest.

  *a.* Banduc vs. Creditors, 4 La. 246; Martin vs. Drum, 12 Ann. 494; Bank of Mobile vs. Harris, 6 Ann. 711.

  *b.* History of Insolvency Act in this State, and meaning in which term "failure" is incontestably used in other sections of these acts. Act 1808, pp. 50, 70, 72; Act 1817, pp. 126, 136, 138; Report of Jurists on Amendments to Civil Code, 1823, p. 392; Acts 1855, p. 432.

    *c.* Use of word "failure" in this sense in Civil Code and Code of Practice. C. P. Arts. 165, 278, 279; C. C. Art. 3027.

    *d.* Analogy from other systems of bankruptcy laws. Rev. Stat. U. S. § 5128, *et seq.;* Mayer vs. Hellman, 91 U. S. 501.

3. *Contemporaneous consideration* required to support transaction within three months. Any legal consideration sufficient—money not the only consideration.

4. *As to renewed and reproduced contracts.* The bank having always held the securities to which the contracts relate, and not intending to diminish its security, can hold under the earlier if not under the later. Seixas vs. Brugier, 37 Ann. 509.

5. *As to exchanged securities.* Where the bank permitted pledged securities to be withdrawn, under an agreement that others should be substituted therefor, the substitutes when given are validly held as effectually under the pledge as had been those withdrawn. *Id.*

6. *Loans to an overdrawn depositor.* Where a bank lends, on pledge of securities, to an overdrawn depositor, it is bound to pay such depositor's checks to the amount of the loan, and cannot be permitted to compensate its debt on the loan with the depositor's overdraft. Nolan vs. Shaw, 6 Ann. 46; Morgan vs. Lathrop, 12 Ann. 257; Breed vs. Purvis, 7 Ann. 53; Hancock vs. Citizens' Bank, 32 Ann. 590.

The opinion of the Court was delivered by

Todd, J. This is a suit brought by the syndic of the insolvent firm of A. Carrière & Sons to recover of the Citizens' Bank a large number of securities which, it is alleged, were illegally acquired by the bank, and to have the transfers of the same declared null, as having been made in fraud of the creditors of the said insolvents.

Some of these transfers are sought to be annulled under the revocatory action. proper, as provided by the Civil Code, and others are assailed as coming under the operation of Section 1808 R. S., relative to contracts made by insolvents within three months next preceding failure.

The answer is a general denial, a special denial that, at the date of the several transactions, the bank knew of the insolvency and a further averment in substance, that the transactions attacked were legal and valid, and for no cause subject to be annulled.

The judgment of the lower court was in favor of the plaintiff for the larger part of the securities and assets claimed in the suit, and also for $83,063.50 for assets collected by the bank.

From this judgment the bank has appealed.

A. Carrière & Sons were private bankers in the city of New Orleans. They did an extensive business for many years, and enjoyed the very highest credit throughout this country and Europe, up to the time of their failure.

The firm went to protest on the 10th of June, 1884, and on the 18th of July following, made a cession of their property under the insolvent laws of the State.

Emile Carrière, one of the members of the firm of Carrière & Sons, was, up to the 9th of March, 1884, and many years prior thereto, president of the Citizens' Bank, and it was during his presidency that several of the transactions between the bank and his said firm took place, which are attacked in this suit.

For a long time prior to the failure of A. Carrière & Sons, their account with the Citizens' Bank had been largely overdrawn, the overdraft amounting at times to several hundred thousand dollars; and it is charged that the transfers of the securities by that firm to the bank, against which this action is directed, were illegal preferences given by the firm to the bank, when in a condition of hopeless insolvency, and that insolvency at the time known to the bank, in the payment or reduction of that large overdraft or pre-existing indebtedness.

Some of these transfers were made more than three months before the failure and others within the three months next preceding that event. The nullity of the former is sought to be declared under the revocatory action and of the latter under the provisions of Sec. 1808 of the Revised Statutes.

I.

We will first direct our attention to the consideration of those transactions sought to be reached by the revocatory action.

This well known action is that given by Art. 1969 of the Civil Code for avoiding "all acts done by a debtor with the intent of depriving his creditors of the eventual rights they have on the property of such debtor."

It is requisite to maintain this action that three things be shown—fraud on the part of vendor; *knowledge* on the part of the vendee, and actual injury to the other creditors.  C. C. 1984; 3 M. 605; 4 R. 408.

The evidence leaves no doubt that, at the dates of these several transfers, Carrière & Sons were insolvents; in fact, they were in a state of insolvency long prior thereto. It moreover appears, however, that they had so well succeeded in keeping their condition a secret, that their insolvency was known to no one, not even to those having the most intimate business relations with them until about the time their notes were protested, 10th of June, 1884, and as stated before, up to that time they enjoyed the very highest credit both at home and abroad.

There is nothing in the record to show that, at that date, the insolvency of the firm was known to or even suspected by any officers of the bank then exercising their functions in its control and administration. There was no express notice to the bank of the insolvency of the firm.

At the dates, however, that the overdrafts of Carrière & Sons were made and some of the subsequent transactions took place, by which, it is alleged, these overdrafts or the antecedent indebtedness of the firm evidenced thereby, was affected or reduced, Emile Carrière, the leading member and manager of the business of Carrière & Sons, was president of the bank, and the insolvency of his firm was known to him; and it is urged that his knowledge of this fact was constructive notice to the bank, by which the bank was bound; and that such notice invalidated all the transactions by which the bank received the assets or securities embraced in these transactions entered into whilst Carrière was president of the bank and afterwards.

We do not, however, propose to discuss this question of knowledge or constructive knowledge here, but will reserve it for another part of this opinion.

As stated before, the bank expressly denies that any of the several transactions assailed were transfers, made to secure an antecedent indebtedness, but avers that they were all made in the usual course of their business and for a valid, present or contemporaneous consideration, and therefore do not come within the scope of the revocatory action or of Section 1808, Revised Statutes.

We prefer, therefore, to address ourselves first to the determination of the real character of the transactions assailed, and if we find one or all of them do not meet the conditions asserted by the bank for its protection and above set forth, the legal principles interposed by the bank for its further protection will then be considered.

On the 19th of March, 1883, A. Carrière & Sons borrowed from the bank $60,000, and pledged certain collaterals as security for the loan, which was evidenced by a pledge note, on the back of which were enumerated the collaterals pledged.

At that time their account with the bank was overdrawn $179,384.76. They at the same date made deposits to the amount of $113,564.18; and immediately checked out $91,158.79, the amount thus checked out exceeding their loan by $22,400. Payments were made on the note amounting to $10,000, and for the balance of $50,000 they drew their check on the bank on the 24th of April, 1884, which amount was credited on their overdrawn account, and the collaterals pledged retained by the bank.

It is urged by plaintiff's counsel that this check discharged the debt for which these securities were pledged. No claim was made for the collaterals by the Carrières, and they have since remained in possession of the bank.

The money paid out by the bank on the faith of these collaterals, was never, in fact, repaid to the bank. The check on the overdrawn account cannot be considered as a payment extinguishing the obligations, but should rather be viewed as merely changing the evidence of the debt for which the pledge note was given.

This was the view of the matter taken by the judge of the first instance, and his judgment rejecting the plaintiff's demand for these securities was correct; and the amendment asked by the plaintiff changing the judgment in this respect cannot be allowed.

## II.

On the 15th of February, 1884, A. Carrière & Sons received $50,000 more from the bank, for which they gave their two notes of $25,000 each, secured by a pledge of collaterals. The pledge reads as follows:

"CITY OF NEW ORLEANS, February 15, 1885.

"Whereas, the Citizens' Bank of Louisiana has discounted certain promissory notes for the sum of twenty-five thousand dollars each, made by A. Carrière & Sons, to the order of the Citizens' Bank, dated on the 15th day of February, 1884, payable 75 and 90 days after date thereof;

"Now, in order to secure the full payment of said promissory notes at maturity, the undersigned, A. Carrière & Sons, do hereby pledge to said Citizens' Bank of Louisiana the following property, to-wit:

[Here follows a list and description of the securities pledged].

"And it is hereby agreed, that in the event of the non-payment of said note at its maturity, the president and cashier of said bank are hereby authorized, jointly or separately, as agents of the undersigned and of the bank, to cause said pledged property to be disposed of for cash, at public or private sale, at the option of said bank, without recourse to legal proceedings, and to this end to sign on the books of the corporations or companies, whose shares are hereby hypothecated as above, any and all transfers of said stock that may be necessary in the premises, in accordance with the rules and regulation of said corporate bodies or companies, and the proceeds of said sale shall be appropriated to the payment of the aforesaid notes, with interest accrued thereon, if any, and all commissions, costs and charges attending said sale.

(P. 418).      [Signed]      A. CARRIÈRE & SONS."

The collaterals pledged for this loan amounted to $57,354.38, and on the same day the Carrières checked out $57,012.54.

The lower court maintained the validity of this transaction, and no amendment is asked for by the plaintiff.

### III.

On the 12th of March, there purports to be another loan by the bank to the Carrières of $100,000. Notes were executed by A. Carrière & Sons for said amount, and collaterals pledged in the same manner and form as before to secure their payment. The notes were then discounted and the proceeds placed to their credit and checked out by the firm. It was, undoubtedly, a real loan.

There is nothing to distinguish this transaction from that of the 15th of February previous, except that in that case the amount placed to the credit of the Carrières, (proceeds of discount) was checked out by the Carrières on the same day, and in this instance several days elapsed before the amount was entirely drawn from the bank. This circumstance, in our opinion, makes no difference as to the legal effect of the transaction. It is contended that the amount derived from the discount was compensated by the prior indebtedness resulting from the overdraft. If such was the case, why did not the same principle or effect apply to the previous loan? If compensation did take place, it took place at the very instant the amount was placed to the credit of the Carrières, and it was not a question of a day or a week or even an hour. In fact, however, compensation does not result in such case.

Application for a loan was made by Carrière, which was granted; promissory notes for amount of same were executed by him and collaterals pledged to secure them; the notes were discounted and the proceeds placed to the credit of his firm, and when this was done, the amount so placed stood as a sum deposited by or for the firm.

Such a deposit cannot be compensated by a previous debt without the consent of the depositor, and here there was no consent. This principle is well settled. 6 Ann. 46; 7 Ann. 53; 12 Ann. 257; 32 Ann. 590.

The judge a quo thought, from the fact that the amount was not checked out for several days, and from the further supposed fact that the transactions took place after Emile Carrière's attention had been drawn to his overdraft by Mr. Miller, the acting president of the bank, that the loan was a simulation, and that the collaterals were turned over to the bank really on account of the antecedent debt.

In regard to the latter fact, the judge was mistaken, since the evidence shows that it was not till the last week in March, that Mr. Miller spoke to Carrière respecting the overdrafts, and this affair, as stated, occurred on the twelfth of that month, and at that time, and even when mention was made to Carrière of the overdraft, not the slightest suspicion was entertained by Mr. Miller of the entire solvency of the

firm. It was evidently regarded and intended by both parties as a loan and the judge was in error in holding otherwise. What strengthens this conclusion is the fact that the money was borrowed by the bank in New York to raise the funds for the Carrières, and their notes indorsed by the bank, negotiated there for that purpose, and one of the notes at least was subsequently paid by the bank.

There is not a particle of evidence that any part of the money received under this loan was ever repaid the bank.

For the purpose of showing such repayment a number of checks drawn by the Carrières in favor of the bank were introduced in evidence. Three only of these checks were dated in March, and they are shown to have related to other and different matters, and were in no way connected with the affairs in question.

### IV.

On the 16th of May, 1884, the Carrières borrowed from the bank $20,000, and on the 19th of same month $21,000, and on the 31st of same month $15,500—all secured by pledges. The securities pledged for these loans were, at the respective dates of the several loans, already in possession of the bank. Some, under the prior pledges of the 19th of March, 1883, and the 15th of February, 1884. The securities belonging to the prior pledges and repledged for the loans of May, were insufficient to pay the preceding pledges. We have held that their prior transactions were valid, and that the bank could legally hold the securities acquired under them. So far then as relates to these securities, that is, to those received under the pledges of the dates mentioned, and repledged in the May loans referred to, it is unnecessary to determine whether the bank derived any right to them under these last loans, since her title to them was perfect under the previous pledges.

### V.

Next we will consider the alleged pledge of securities in January, 1884.

The judge a quo held that there was no such pledge, and the bank was not therefore entitled to hold the securities claimed under it. We do not concur with the judge's conclusion in this respect. It is certain that Emile Carrière did deliver to the cashier of the bank certain securities, with instructions to retain them for the bank; that they were placed by the cashier in an envelope, to themselves, properly marked, and he, acting for the bank in his official capacity, kept possession of them for the bank. If this transaction was not attended with all the formalities observed in the other pledges above mentioned, still it was

substantially a pledge, and fully authorized the bank to retain the securities unless invalidated for some other cause than the lack of form.

· The confusion on this point doubtless arose from a statement made by Mr. Carrière about the same time when his attention was called to the overdraft of his firm by the cashier. It was to the effect that all he had in the bank was security for his overdraft, which, of course, would include the claims of the firm in the bank for collection, which were entirely at his (Carrière's) disposal, and to withdraw at his pleasure, and which could not therefore be the subject of a pledge.

But still, it is beyond question that Mr. Carrière did deliver to the cashier, as stated, certain designated securities with the positive instruction to retain them for the bank on account of or as security for the overdraft. It is contended by the counsel for the bank that the "overdraft" mentioned or alluded to in this transaction, and which the securities pledged were designed to secure, did not refer to the past or then existing overdraft, but to future overdrafts by the firm. And the fact that Carrière's overdrafts rapidly increased after this affair up to March following, until it even exceeded in amount the securities pledged, lends some color to the contention. But another consideration makes it a matter of no importance whether the pledge was for the one purpose or the other; and this brings us to the discussion of a legal principle which is, in itself, a potent factor in the decision of the case, viz: the question of knowledge on the part of the bank touching the insolvency or insolvent condition of the Carrières at that time.

This point has been elaborately argued by counsel on both sides, and they have brought a vast array of authorities to support their respective contentions.

It is plain that, if these collaterals were pledged to secure the past overdraft of A. Carrière & Sons, representing their antecedent indebtedness to the bank, and the bank knew at the time of the insolvency of the firm, the transaction could be reached and avoided by the revocatory action.

We have no doubt but, at that date and long prior thereto, the condition of the Carrières was one of complete insolvency.

We are equally as well satisfied that up to that time the bank, its officers, and we might say "all the world," was in entire ignorance of that fact. It is urged, however, that, as Emile Carrière was at the time of this transaction the president of the bank—and was of course thoroughly cognizant of the insolvency of his firm, of which he was the leading and managing member—his ( Carrière's ) knowledge was

the knowledge of the bank and operated as constructive notice of the fact of insolvency of the firm.

We have weighed with care and deliberation the able argument of counsel on this point, and have studied diligently and exhaustively the numerous authorities cited by them, and our conclusion is this:

That, as a general rule, the knowledge of an agent is the knowledge of the principal.   And even where an agent deals in a double capacity for his principal and himself at the same time, and where his acts are evidently designed and intended to benefit or favor the principal to his own prejudice or that of his creditors, even in such case his knowledge of his condition or other material fact will be regarded as the knowledge of the principal.   But where such agent seeks his own personal interest or advantage in the affair, without benefit to his principal, then his knowledge cannot be held to be the knowledge of the principal.

Let us test these rules by the facts, circumstances and surroundings of this transaction and see how it results.

The evidence makes plain that the firm was at the time wholly insolvent, and had been so for several years; that this insolvency had been carefully and successfully concealed, and in consequence the vast credit the firm enjoyed at home and abroad remained unimpaired.   The business of the firm mainly was dealing in exchange, domestic and foreign, and its large credit was the foundation upon which it acted.   It was in truth the very life of the firm, without which it could scarcely exist for a day.

Under this state of things, Carrière's prime motive was to continue to conceal his unfortunate condition and maintain his credit.   His only hope of succeeding in this rested on the Citizens' Bank.   If he maintained his credit with that institution, he could still retain the presidency of it, and thereby avail himself of the opportunity that such a position afforded to draw on its resources and obtain its money to prop up the sinking condition of his firm and perhaps retrieve its desperate fortunes.   It is not at all evident that at that time Carrière contemplated failure.   He or his firm had so long subsisted on credit only, that he evidently believed that by the ingenious methods pursued in the past it could continue to do so, and with the help of the bank's means within his reach he might weather the storm and come out finally all right.

The necessity was upon him, therefore, to make some show to the bank to avert any suspicion of his real condition that might be deduced from his heavy overdrafts, not only with this bank but in nearly every

other bank in the city and in several of the largest banking establish-
ments of the old world.

In this great crisis, can we readily believe that Carrière placed those
January securities with the bank to benefit the bank alone, by paying
in part his existing debt to it, without ulterior purpose in view looking
to his own advantage? We cannot reasonably so conclude. The heavy
drafting that followed this transaction, and the salient fact that after
this he succeeded in obtaining some $200,000 from the bank, affords
confirmation strong of the wholly selfish purpose that actuated him in
this transaction. He was driving a bargain for himself alone.

Under these circumstances, we are forced to the conclusion that the
bank should not be held to a constructive knowledge of the insolvent
condition of A. Carrière & Sons at that time and in the affair in ques-
tion, and that this want of knowledge protected the bank as relates to
this transaction; and the same must be held valid and the bank enti-
tled to keep the securities then received. *In re* European Bank, 5
Chancery Appeal Cases (Law Reports), p. 358; Lucas vs. Bank of Da-
rien, 1 Stew. (Ala.) 280, 295; Winchester vs. Railroad Co., 4 Md. 231;
Barnes vs. Trenton Gas-light Co., 27 N. J. Eq. 33; Peckham vs. Hen-
dren, 76 Ind.

On the — day of January, 1884, the bank made a loan of $6,600 to
one H. Lange. Lange gave his note for the amount and pledged cer-
tain State bonds as security for the loan. Emile Carrière, without
authority so far as the record discloses, withdrew these bonds from
the bank and substituted for them two promissory notes called and
described as the Benachi notes. Mr. Lange made no complaint of this
substitution, so far as we can discover. The bank has never been paid
this loan. The plaintiff seeks to recover the notes deposited in lieu of
the State bonds. Lange got full value for the bonds, and the bank
security was weakened or impaired by the substitution. We conclude
from all the evidence touching this matter, that it was a *bona fide* loan
and that the plaintiff could not legally have deprived the bank of the
State bonds originally pledged and cannot reach the notes substituted
therefor. The substitution or its validity is settled by the Brugier
case, 37 Ann. 509.

### VI—DeSmet Transaction.

On the 20th of January, 1884, the account of one Emile DeSmet with
the Citizens' Bank was overdrawn to the amount of about one hundred
thousand dollars. This overdraft was by the permission of Emile
Carrière, then president of the bank, and who acknowledged himself
responsible for the same.

This indebtedness was evidenced by eight promissory notes of De-Smet, secured by a mortgage on certain saw-mills at Moss Point, Miss., and a pledge of a number of collaterals. These collaterals were held by the bank from the time of their delivery to the 12th of May following. On that day they were given up to DeSmet, in order that he might transfer the mills to Carrière & Sons with the understanding that they were to remortgage the property to the bank on receiving title thereto from DeSmet. This understanding was carried out on the 14th of the same month the transfer was made and the new mortgage executed. This arrangement was made at the request of Mr. Miller, the president *pro tem* of the bank, who preferred the obligation and mortgage of the Carrières to that of DeSmet

Besides the mortgage on the mills given by DeSmet, the bank held DeSmet's note for $41,111 due on the 28th of January, 1884. In part settlement of this note on the same day that it matured the bank acquired from DeSmet notes amounting to $38,000, and for the difference between the discount of their notes, and note owing by DeSmet he gave his check in payment.

These notes or collaterals were handed by E. Carrière to the cashier of the bank, who received them as coming from and belonging to DeSmet, and there is no satisfactory proof that the Carrières had any interest in them.

On the 9th of April, 1884, the overdraft of DeSmet amounted to $104,000, and on that day there was a partial settlement between the bank and DeSmet. The $38,000 of notes which had been discounted for DeSmet were charged back to him. This made DeSmet's indebtedness, with interests, amount to $145,000, for which sum he gave his notes, indorsed by A. Carrière & Sons, secured by pledge of the mortgage notes for $100,000 already held by the bank and the $38,000 notes discounted in the previous January as stated, and on that day recharged to DeSmet's account. To these notes was added a pledge of another note of $10,000, making $48,000 of notes held by the bank, these notes being known as logmen's notes. After the transfer of the mills from DeSmet to the Carrières on the 15th of May, already mentioned, a final settlement was made with DeSmet. His indebtedness then amounted to $195,000.

The Carrières assumed the payment of this entire sum, and gave a new mortgage on the mills to secure the same in lieu of the one previously given by DeSmet.

There can be no question in our opinion that this mortgage was valid at least to the amount of $100,000, the amount of the prior mort-

gage given by DeSmet on the same property. Beyond that sum, it is useless to inquire since the property sold for only $38,000. It is not pretended by the plaintiffs' counsel that this mill property was worth more than $70,000.

The mortgage given by DeSmet on this property was not assailed. The transfer to the Carrières of the mills was, as stated, with the distinct understanding and agreement that they would assume the debt of DeSmet, and mortgage anew the property, so soon as they received title, as security for the debt assumed. The affair cannot well be viewed in any other light than the substitution of one debtor and one mortgage for another.

It is, however, urged in opposition to this view of the matter, that all the securities connected with this debt of DeSmet did not belong to DeSmet, but to the Carrières, and that the pledging of them to the bank was the act of the Carrières as guarantors of the debt and not the act of DeSmet.

DeSmet was the real debtor to the bank to the amount stated above, resulting from his overdraft, and notes of which he was the maker. The liability of the Carrières for the debt was secondary or contingent, that of guarantors or indorsers. The collaterals pledged as additional security were notes payable to DeSmet, and the evidence of a title to any of these securities in the Carrières is, by no means, satisfactory and it is incumbent on plaintiff to prove this. We think, therefore, that it is safe to conclude that the transaction touching this debt was the act of DeSmet, although made through and by Emile Carrière, who felt himself bound for its payment.

But, suppose that we are mistaken in regard to this, and that all these securities belonged to the Carrières, and that the debt for which they were pledged was their debt and in making the pledges of January and April, 1884, which embraced all these securities, the mortgage notes of DeSmet and the collaterals mentioned, Emile Carrière was acting for his firm and the pledge was made not for DeSmet's debt but for the debt of the firm, would such considerations annul the pledge and entitle the plaintiff to recover the property and securities?

At that time, (the 7th of April, 1884), Emile Carrière still remained as the managing partner of his firm, but he had ceased to be president of the bank. Mr. Miller became acting president of that institution on the 9th of March, 1884, and permanent president on the 7th of June following.

After the former date, Carrière had nothing whatever to do with the bank—he neither had unexercised any authority in its management or

administration. Now, were this affair of the 7th of April an undistinguished pledge or transfer of securities for the overdraft or antecedent debt of Carrière & Sons to the bank, there would be no cause to annul the transaction if the bank at the time had no knowledge of the insolvency of the firm and this settlement or partial settlement was made more than three months prior to the failure of the firm. In fact, the securities in which this affair of the 7th of April was founded, had been placed with the bank in the preceding January, as shown above, and this transaction as well as the subsequent ones of May mentioned, of the transfer of the mills to Carrière & Sons and the remortgaging them to the bank, related to the transaction in January. All these several acts were but parts or details of one transaction having its beginning and foundation in January, 1884.

At the time of this settlement of the 7th of April, and its complete consummation in May, the situation in one very important respect had changed. Carrière was no longer president of the bank, and had nothing to do with its business or management. He was not acting in any double capacity in this affair, but represented himself or his firm alone. The bank acted through its then president, Mr. Miller. Apart from the question of the insolvency of the Carrières, the transaction relating to this DeSmet business was unassailable. As before stated, there was not then any suspicion of this insolvency on the part of the bank or its officers that we can discover from the evidence, but Carrière dealt and was dealt with as a solvent member of a solvent firm, and from the circumstance of being then in no manner connected with the bank, he stood in the attitude of a stranger to it.

### VII.

This brings us to another important question as to whether the 7th of April was within the three months next preceding the failure, for if it was, the want of knowledge touching the condition of the firm, could not save it from the operation of Sec. 1808, R. S.; and this necessitates another and further inquiry, and that is, when did the failure of A. Carrière & Sons take place?

That question is, when did the failure of A. Carrière & Sons take place?

To determine this we must first refer to the law bearing on the disposition of property made by insolvents within three months preceding failure.

That law in the section above mentioned, 1808 R. S., reads thus:

"That any debtor, who shall be convicted of having, at any time within the three months next preceding *his failure*, sold, engaged or

mortgaged any of his goods and effects, or of having otherwise disposed of the same, or confessed judgments in order to give an unjust preference to one or more of his creditors over the others, *shall be debarred from the benefit of this Act*, and the said deeds or acts shall be declared null and void; provided, however, that if the purchaser of such property shall prove that the said property was either sold or engaged to him for a true and just consideration, by him *bona fide* delivered at the time of such deed, then and in that case, the said sale and mortgages shall be declared valid."

Our first inquiry must be touching the meaning of the term or word "failure" as used in the section.

The history of the legislation connected with this section is well calculated to throw some light on this point and will assist us at arriving at a proper conclusion touching the true meaning of the term referred to.

As early as 1808, we find an act entitled : "An act for the Relief of Insolvent Debtors in Actual Custody, etc."

The 17th section of that act is identical with Sec. R. S. 1808, above quoted, except that, instead of the words " three months previous to his failure," in the latter section, we read "three months previous to his arrest and imprisonment" in the former.

In 1817, the legislature extended the benefit of voluntary surrender to debtors not imprisoned as well as to those who were, and passed a general insolvent law under the title of "an act relative to the voluntary surrender of property and to the mode of proceeding as well as for the disposal of the 'debtor's estates and for other purposes.'"

This act was reproduced with but slight changes in 1855, and the 25th section of it *ipsissimis verbis* constituted the Sec. 1808 R. S. referred to.

Thus it will be seen from the history of this legislation that, the provision of this section last named, (R. S. 1808) was originally, and all subsequent amendments and re-enactments, part of a statute the declared object of which was mainly to deal with the cession of property by insolvents, or judicial insolvency. This word "failure" is several times used in other sections of the act, and obviously with no other meaning than judicial failure or judicially declared insolvency.

It is also used in the same sense in the articles of our codes. C. P. 165; C. C. 3027.

All bankrupt laws contain a similar provision with our State insolvent laws prohibiting the giving of preferences by the debtor within a stated period to the actual bankruptcy, and this period dates back from the commencement of the proceedings in bankruptcy—that is the

application of the insolvent debtor for the benefit of the bankrupt law.

And in speaking of the importance of thus fixing a definite and known limitation in the bankrupt law, the Supreme Court of the United States, in the case of Mayer vs. Hellman, 91 U. S. 501, uses this language:

"There is sound policy in prescribing a limitation of this kind. It would be in the highest degree injurious to the community to have the validity of business transactions with debtors, in which it is interested, subject to the contingency of being assailed by subsequent proceedings in bankruptcy."

Apart from any legal authorities or precedents, reason and a consideration of the purposes of the statute would teach that the word "failure" as there used, does not signify a condition of insolvency uncertain and undetermined, but refers to a fact authoritatively fixed, an event certain and determined. The statute otherwise would lead to the greatest confusion and embarrassment and often to the grossest injustice. It is what may be termed severe in its provisions, a harsh law, for it strikes with nullity all contracts giving a preference, although the creditor may have acted in the best of faith and in entire ignorance of the insolvency of his debtor. Such a provision should be rigidly construed, and the proscriptive term against the right to contract should be narrowed down to the shortest limit consistently with the language and plain intent of the law.

It is, however, urged that we must accept in this instance the meaning of the word as declared in Art. 3556, Sec. 11, C. C., and failure is there defined to be "the situation of a debtor who finds himself in the impossibility of paying his debts."

This definition, if it be one, evidently refers not to an established fact or known event, but to a mere condition. There is a serious obstacle in the way of taking this meaning of the term failure used in the statute, as illustrated by the facts of this very case. The evidence shows that the Carrières were in a situation to find themselves "in the impossibility of paying their debts" for months and even years before their declared failure. To take such condition as the statutory meaning of failure, would necessarily imply that contracts made in the course of their business, years before their judicial or known insolvency, could be annulled so soon as this condition of insolvency and the commencement of it could be found out or disclosed. No such contention has ever been set up, and it is palpable that such a construction would do violence to the intent and meaning of the law.

Another consideration presents itself to our minds as leading to the

same conclusion. This insolvent law, the section of which we are discussing, was a law of universal application, that is, it was applicable to all persons in the condition described, without regard to their callings or pursuits, and whether they belonged to the commercial or non-commercial class.

Some circumstances—such for instance as a protest of his note—might be sufficient to make known a failure with respect to a banker or a merchant, or others engaged in a commercial business. Whilst a like circumstance would be without such significance with regard to a planter or others engaged in similar callings.

An insolvency, judicially declared, would remove all doubt and uncertainty, and afford the very highest evidence of the fact of failure. It would place the initial point from which the prescribed term, the "*tiempo inhabil*," of three months, was to be traced back, beyond all controversy. Then the contracts which, under the rigid provisions of the statute, were to be stricken with nullity, would be so completely hedged in by fixed boundaries as to be of easy ascertainment.

We are not left alone to reason and conjecture on the rules of construction to guide our opinions on this point: the courts have not been altogether silent on the subject.

The first case in point is that of Banduc vs. His Creditors, 4 La. 247. On the 17th of April, Banduc gave a special mortgage to secure an antecedent debt. On July 30, three and a half months afterwards, he made a cession of his property. It was claimed by some of his creditors that this mortgage should be annulled, as having been given within three months of his actual and known insolvency, though more than three months before his cession or judicial insolvency. The decision of the lower court sustained the mortgage. On appeal it was tried before Chief Justice Martin and Associate Justices Matthews and Porter. In the opinion of Justice Matthews we find the following emphatic declaration on this point. He said:

"Whatever may be the doctrine established by the decisions of the tribunals in France, in relation to the time of failure, as recognized by the laws of that country, whether it be the period of the actual cession of property by an insolvent, or that of his inability to meet his engagements, as evidenced by the protest of his notes, etc., I consider it useless to inquire, believing, as I do, that the absolute nullity of contracts made by a debtor, as fraudulent towards his creditors, and such as our insolvent laws declare to be void, are those contracts alone which are made *within the three months preceding his actual failure and surrender of property.*" P. 256.

It is, however, insisted by the counsel for plaintiff that this expression is the opinion of Judge Matthews alone, and should not be regarded as authority.

Judge Martin also read an opinion in the case, and whilst he does expressly announce his concurrence with Judge Matthews on this particular point, he must necessarily have concurred with him. Both judges agreed that the creditor did *not* know of the debtor's insolvency, and Judge Martin must also have believed that "failure" meant judicial failure as announced by Judge Matthews, since, if he had counted the three months as beginning at an earlier date—that of the actual (though not declared) insolvency of the debtor, he must have set the contract aside on the ground that it was entered into within the three months in contravention of the prohibition in the statute.

Judge Porter dissented on the ground that, though the transaction took place more than three months before the cession, and though dissenting, he nevertheless, in the course of his opinion, stated that it had always been his impression that "failure" meant judicial failure, and was to date from the cession as declared by Judge Matthews, though the argument then heard had somewhat shaken his belief on this point.

Since all three of the judges seemed to be in accord on this point, although it may not be held the strictest accord, we think the decision as relates to this point entitled to due weight.

The case of Bank of Mobile vs. Harris, 6 Ann. 711, has a significant bearing on this point. From the facts of that case the inference is plainly deducible that there was an entire acquiescence in the doctrine of the Banduc case. A party who was notoriously insolvent, but made no surrender of his property, executed a mortgage in favor of his brother to secure an existing debt after he had been protested. It was attacked on the ground that it gave a preference.

If the failure of the insolvent was to date from the protest of his draft—his actual insolvency—then the mortgage was a nullity because given within the three months next preceding actual insolvency and protest. The opposing creditor was represented by the most learned and distinguished counsel—Messrs. Benjamin & Micou—yet no suggestion by them, nor the slightest intimation from the court, that the contract was stricken with nullity, because made within the prohibited period. On the contrary, the discussion turned and the decision rested entirely on the knowledge and *bona fides* of the preferred creditor.

Again in the case of Martin vs. Drumm, 12 An. 494, the Court said with respect to this matter:

"The presumption established by the Act of 1817, re-enacted in 1855, (R. S. p. 257, § 28), applies evidently *only to cases* in which proceedings are instituted against the insolvent to deprive him of the benefit of the insolvent laws, on the ground of his having given an unjust preference to one or more of his creditors over the others."

We think we have said enough to make it apparent that the conclusion is well nigh irresistible from these various considerations, that failure is not to be taken in the true sense of the statute as dating from actual insolvency, protest or other like circumstance, but from actual cession or insolvency judicially recognized and declared.

We have been referred to the recent case of Black, Syndic, vs. Richardson Savings Bank and Kennedy, and Seixas, Syndic, vs. Brugier, as opposed to the conclusion reached by us on this point. None of these cases have any direct bearing on this question, for in none of them was there any issue raised as to the true meaning of the term as found in this section of the Revised Statutes.

It is, however, urged that such a construction would be unfortunate, inasmuch as it would allow an insolvent debtor too much latitude in the disposition of his property and in fraudulent-contracts against his creditors, and that it would place it in his power to defeat even the main object of the law by delaying to make a cession of his property or refusing to make one altogether.

This contention will lose its force when we consider that the creditors of an insolvent have the right, whenever a state of insolvency exists, to compel him to make a cession or surrender.

The insolvency of A. Carrière & Sons and their cession made on the 18th of July, 1884, and the conclusion reached on the point just discussed, would subject to the operation of the Statute just considered only those transactions between the Carrières and the Citizens' Bank, as occurred after the 18th of April, 1884, leaving those before that time subject only to the revocatory action.

The DeSmet transaction having preceded the date above mentioned is excluded from the operation of the Statute, and is governed by and subject to the revocatory action alone, and this includes the affairs connected with it of May, which, as we have shown, were but parts' of the same transaction and but the carrying out of the previous understandings or agreements of the previous January and April.

## VIII.

Manuel Escobal pledged to the Citizens' Bank certain collaterals and twenty-two bales of leaf tobacco to secure two notes given by him to

Seixas vs. Citizens' Bank.

the bank for $8,000 and $5,000 respectively. The lower court maintained the bank's title to the securities, and there has been no amendment of the judgment asked for in this respect, and we are therefore relieved of the further consideration of the transaction.

Escobal had overdrawn his account with the bank for several years, with the permission of Emile Carrière. On the 29th of March, 1884, the overdraft amounted to $111,984, and for which Emile Carrière acknowledged himself responsible, and Carrière & Sons furnished their four notes to the bank to cover said amount; securities were pledged and discounted as before, and a check drawn by the Carrières in favor of the bank for the proceeds. Escobal's account was thus closed. The Carrières were to pay the debt and Escobal was released.

The release of Escobal by the bank was a good and sufficient consideration for this transaction with the Carrières. It does not require a moneyed consideration to protect the contract from the operation of Section 1808, R. S., or the reach of the revocatory action. Any legal consideration will suffice. Their assumption of Escobal's debt, whereby the bank released him from liability, was a good and sufficient consideration for the contract, and we see no reason to question its validity or the title of the bank to the securities received under it.

Even, however, if the consideration was not sufficient and contemporaneous, but was nothing more nor less than a transfer or pledge for an antecedent debt, it cannot be annulled for reasons given with respect to the DeSmet affair. The same principles and reasons apply to all transactions between the parties occurring in the interval preceding the 18th of April, 1884, and the 9th of March of the same year, the date when Mr. E. Carrière retired from the presidency of the bank, which includes the pledges of the 12th of March, as well as those of the 29th of March and 7th of April, specially mentioned above.

## IX.

There is some mention made in the opinion of the judge *a quo* in the record, of a pledge of the 7th of June, 1884. It does not seem to be an object of much contention, since it is not mentioned in the brief of plaintiff's counsel, and briefly referred to by one of defendant's counsel. It consisted of the discounting of a number of collaterals received by the bank under its several pledges, and putting the proceeds to the credit of Carrière & Sons. This was done by direction of Mr. Miller, the president, as explained in his testimony after the death of Mr. A. Carrière, so as to close the account. It has no significance or bearing whatever that we can see upon the issues in the case.

---

Seixas vs. Citizens' Bank.

---

## X.

On the 23d of April, 1884, Mr. E. Carrière, by permission, withdrew some of the securities acquired by the previous pledges and substituted other paper in lieu of them. These substitutes are claimed by the syndic. We think the substitutes took the same status of the notes withdrawn, and the bank held them by a right equal to that entitled to hold the original. The substitution is covered by the Brugier case, 37 Ann. 509.

This completes the review of all matters and issues presented in the case, the examination of which has consumed much time and involved great labor.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed in the following particulars, to wit:

1. In so far as it maintains the validity of the pledges executed by A. Carrière & Sons to the Citizens' Bank of March 19, 1883, and February 15, 1884, and recognizes the title of bank to the securities received under them.

2. In so far as it maintains the right of the bank to hold and retain the other securities mentioned, designated and described in the opinion and judgment, whether embraced or included in said last mentioned pledges or not.

3. In so far as it rejects the demand of plaintiff to the bonds of the St. Louis, Atlantic, Canal and Transportation Company, and the disposition made in the decree respecting them.

That in all other respects it is further ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and the plaintiff's demand be rejected with costs of both courts.

Bermudez, C. J. concurs in the decree.

---

### CONCURRING OPINION.

POCHÉ, J.    While I concur in the decree rendered in this case, I am not in accord with all the reasons contained in the opinion as adopted by the majority of my associates, and I therefore rest my concurrence on the following considerations:

The essence of success in all actions intended to abrogate contracts entered into by insolvent debtors, at the instance of one or more of their creditors, is the intention of the debtor to injure some of the creditors and to benefit others.

In the revocatory action, the intention must be proved against both the preferred creditor and debtor, together with knowledge of the creditor touching the state of insolvency of his debtor.

In the action under Section 1808 of the Revised Statutes of 1870, it is sufficient to prove the intention of the insolvent debtor in the contract assailed, to give an unjust preference to one or more of his creditors over the others, without any proof of either knowledge or intention on the part of the preferred creditor.

A careful consideration of all the facts connected with the numerous transactions assailed in this case, has forced on my mind the clear conviction that, in all the contracts between the Citizens' Bank and the firm of A. Carrière & Sons, through the instrumentality of Emile Carrière, either when he was acting in his dual capacity or when he was dealing as the manager of his firm with his successor as president of the bank, Emile Carrière never was animated with the least intention of benefiting the bank.

The record shows, beyond any reasonable doubt, that for several years previous the firm of A. Carrière & Sons was alarmingly insolvent to the full and almost exclusive knowledge of Emile Carrière, who found in the bank and its funds the only means of sustaining the waning credit of his firm both at home and abroad, but principally with their foreign correspondents.

Now, in order to quiet the alarm, and to lull the lurking suspicion of the directors of the bank, which were gradually arising from the unreasonable overdrafts, and from his suretyship on account of the ravenous demands of dangerous customers, such as DeSmet and Escobal, he quickly heeded the warnings of the cashier, and reduced his overdrafts by sundry contracts of pledge; but it is clear to my mind that he was not actuated with any motive to enhance the condition of the bank as a creditor, but that his simple and very apparent purpose was to pave his way to other overdrafts and to a constant bleeding of the bank of its resources.

By those means, his true intention was concealed, a false sense of security was created in the minds of the managers of the bank, and his double dealing game was successfully played until the occurrence of the fatal catastrophe; the death of his father, opened the eyes of all, and burst his ingenious bubble.

The result was that, at the date of their failure, while the indebtedness of the firm to the bank, had assumed a different form, it had not been practically affected to the advantage of the bank, but that, on the contrary, that corporation was one of the heaviest sufferers in the disaster.

The record shows that, on the wake of each of the pledges made to the bank, the firm of A. Carrière & Sons invariably drew repeated

and immense amounts of cash, which had the effect of swelling the amount of their indebtedness to the bank, on that score, to an extent exceeding the amount of their original overdrafts.

I therefore conclude that through and by means of the multifarious transactions included in plaintiff's attack, there was no intention of benefiting the bank on the part of Carrière, and that practically no such effect can be attributed or traced to any of the contracts which have been subjected to judicial test in this controversy.

Entertaining these views, I find no necessity for the discussion of the vexed questions of the knowledge of the agent as an equivalent to the knowledge of the principal, and of the date from which the three months contemplated by Section 1808 should be computed. Hence I take no part in the discussion of either of these questions, and I am not committed to the views of the majority therein.