On Rehearing.
SOMMERVILLE, X
Plaintiff, a judgment creditor of the firm of W. A. Tompkins & Sons, and the individual members of that firm, -alleges that he became the purchaser and owner of a certain vendor’s lien note issued' by Albin Tompkins to his father, W. A. Tompkins, in part payment for certain land in Webster parish then owned by W. A. Tompkins; that the note was for $4,500, dated May 13, 1914, payable one year after date; and was made and issued by Albin Tompkins payable to his own orderthat the note was delivered to W. A. Tompkins, and subsequently was delivered by W. A. to Albin Tompkins, the maker, for some undisclosed purpose, but without consideration, at a time and place unknown to petitioner; that Albin Tompkins pretended to return the note to his father, but, instead thereof, he gave to him a forged note similar in all respects to the original, which said forged note is now in the possession of W. A. Tompkins ; that Albin delivered the genuine note to D. P. Batchelor, without consideration, and that Batchelor delivered it to R. W. Harkness, the owner of the Tompkins property at the time this suit was filed, and that Harkness delivered it to the clerk of court, and caused said note to be canceled and the mortgage securing it erased from the records of the parish; that such cancellation and erasure were illegal, null, and void; that he caused the note to be seized under a fieri facias and sold in satisfaction of the judgment held by him against W. A. Tomp *925 kins & Sons; that he bought said note at sheriff’s sale; and he now asks in this suit that the note and mortgage should be held to have been canceled in error by fraud, and that they should he held to be in full legal force and effect, as a vendor’s lien against the W. A. Tompkins home place ih and near Minden, La., as set forth in the petition.
The suit is a most unusual one; and it is stated on plaintiff’s brief that—
“The object and purpose of this suit is to have the court give judgment, decreeing that the note was the property of W. A. Tompkins, and not legally canceled by the clerk of the court when R, W. Harkness presented it for cancellation, because it had not been paid, was not paid, and not due at that date; that R. W. Harkness obtained it without consideration from D. P. Batchelor, who was not the legal owner of same; and that Albin Tompkins obtained it from his father, W. A. Tompkins, fraudulently, and pretended to return it to him by leaving a bogus or forged note in place of the one his father let him have.”
There are many other matters mentioned in the petition than those just referred to as "the object and purpose of this suit.” They will be noted in due time.
The sale by W. A. Tompkins of his home place to his son Albin is alleged by plaintiff, and that sale is not attacked by him. On the contrary, he is claiming a part of the proceeds of that sale, represented by the note involved in this case. It would appear that there were two acts of sale made by W. A. Tompkins to his son Albin. One was for $18,000 cash, and the other was for $13,500 cash, and the balance was represented by a note for $4,500, payable one year after date. The first act of sale was presented to R. W. Harkness and his attorney for examination at the time that Albin Tompkins sold the property to R. W. Harkness. That act was not recorded at the time; but the notary and Albin agreed to have it recorded on the following morning. This was not done. But on the second day thereafter the act which referred to the $4,500 note was registered, and that is the act upon which this suit is based. The other act, for $18,000 cash, has entirely disappeared.
[1] That is only one of the mysteries in this strange suit. There is no evidence going to show that W. A. Tompkins ever came into possession of the original $4,500 note. The only testimony with' reference to this note is that it was in the possession of Albin Tompkins on June 14, 1914, when he delivered it to Batchelor as collateral security for the payment of $250, which money he obtained from Batchelor for the purpose of paying taxes on some of his (Albin’s) property. On that same day, and at the time of delivery, Albin directed Batchelor to transfer the note, after the $250 had been paid to him (which was subsequently paid), to Harkness, who had bought the property, with instructions to have the note canceled. When Albin transferred the note to Batchelor it was for a consideration. The transfer was to secure the payment of $250. And when Albin ordered it transferred to Harkness it was also transferred for a consideration; that is, for $4,500. When Albin sold the real estate to Harkness it was for cash, and free from incumbrance, for $20,000. Harkness paid the $20,000, or its equivalent in other property, to Albin Tompkins; and, when Albin had registered the second act of sale, containing the note for $4,500, as a part payment thereon, and which operated as an incumbrance upon the property then standing in the name of Harkness, it was to carry out this obligation of delivering the property to Harkness unincumbered. That was the sole cause for Albin Tompkins’ order to give the note to Harkness for cancellation. There was therefore full consideration1 given by Harkness for said note; and he had the legal right to have it canceled from the records of the parish.
[2] The allegation that the note just referred to was delivered by W. A. to Albin *927 Tompkins ior any purpose whatever was not supported by evidence. Of course, it was not shown whether this transfer was by gratuitous or by onerous title. W. A. Tompkins did not testify as a witness, although plaintiff sought to obtain his testimony. Tompkins appears to have refused to testify in the case, and plaintiff did not resort to legal methods to compel him to testify. It would thus appear that this negotiable note passed .into the hands of Albin Tompkins, the maker, before maturity, and that he caused it to be ■canceled. “The possession of such paper carries the title with it to the holder. The possession and title are one and inseparable.”
“The party [I-Iarkness] who takes it before due for a valuable consideration, without knowledge of any defect of title, and in good faith, holds it by a title valid against all the world.”
“Suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title. That result can be produced only by bad faith on his part.”
“The burden of proof lies on the person who assails the right by the party in possession.” Doll v. Rizotti, 20 La. Ann. 263, 96 Am. Dec. 399; Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857.
[3] When the note, as alleged by plaintiff, came into the possession of Albin Tompkins, the maker and mortgagor, confusion took place, and the subsequent reissue of the note did not revive the mortgage.
“When the qualities of debtor and creditor are united in the same person, there arises a confusion of right, which extinguishes the obligation.” C. C. 2217.
“Consequently, it is essentially necessary to the existence of a mortgage, that there shall be a principal debt to servo as a foundation for it.
“Hence it happens, that in the cases where the principal debt is extinguished, the mortgage disappears with it,” etc. C. C. 3285.
When the note, if ever issued by Albin Tompkins to his father, was returned into the possession of Albin Tompkins, the maker, the note and mortgage were extinguished by confusion, and this suit should end here.
The existence of a bogus or forged note was not proved. No such note was offered in evidence. And the only testimony concerning- same is merely hearsay, to the effect that W. A. Tompkins said that he had such a note. But it was not sufficient to show that there was a note in existence, or that W. A. Tompkins was really in possession of such a note.
The testimony of two witnesses that they had seen a note in the possession of W. A. Tompkins, and that he questioned the genuineness of that note, is not -sufficient to prove that it was at all similar to the note in suit.
In addition to “the object and purpose of this suit,” as stated on counsel’s brief, it is alleged in the petition of plaintiff that W. A. and Albin Tompkins were insolvent at the time that the note was delivered by W. A. to Albin Tompkins, and that such delivery was made in fraud of their creditors, particularly plaintiff.
There was offered in evidence the records of four suits brought against W. A. Tompkins & Sons, two of which were filed in January, 1914; and the .other two some time after the alleged transfer of the note. These suits were on contracts made in 1913. The two suits filed in January, 1914, went to judgment in October, 1914; and this present suit was filed on January 6, 1915.
Writs of fieri facias were issued on two of these judgments, and the sheriff returned, in one instance, that no property was to be found. This single return of nulla bona, coupled with the fact that W. A. Tompkins & Sons had sold out their mercantile business, that W. A. Tompkins had gone to Shreveport, where he engaged in business, and that Albin Tompkins had disappeared entirely, was the only evidence to support the allegation of insolvency of W. A. Tompkins.
*929 [4] This evidence, in our opinion, was not sufficient to prove insolvency of W. A. Tompkins. And counsel for plaintiff on his brief says:
“The evidence of the insolvency of Tompkins is not well established by the record and by the return of nulla bona on the writ of execution, but by the testimony of the witnesses in the case.”
He then quotes from the testimony of C. M. Roberts and Dr. R. C. Tompkins, brother of W. A. Tompkins. But the evidence of these two witnesses is not conclusive of the insolvency of W. A. Tompkins. When O. M. Roberts was under cross-examination he was asked whether Tompkins had real assets after he had sold the New York Bargain Store, and he answered:
“I presume that he had the proceeds of the sale of the property.”
Again he was asked:
“That put it where the creditors could not get it?”
He answered:
“That may be true; probably is.”
And Dr. R. 0. Tompkins testified:
“That after they had sold the New York Bargain Store they had no merchandise or any other kind of business, and they owed him a debt that he could not collect.”
But this witness did not testify as to his own knowledge. He simply said that he was testifying from hearsay.
While such evidence does not sustain the allegation of insolvency of W. A. Tompkins, other evidence in the record shows conclusively that Harkness and Batchelor, two of the defendants in this cause, were not aware of such alleged insolvency, and it further shows that they acted in absolute good faith in taking the note from Albin Tompkins. The Code provides in article 1969:
“From the principle established by the last preceding article, it results that every act done by a debtor with the intent of depriving his creditor of the eventual right he has upon the property of such debtor, is illegal, and ought, as respects such creditor, to be avoided. This can be done in the mode and under the circumstances set forth in the following rules.”
Article 1978 provides that:
“No contract shall be avoided by this action but such as are made in fraud of creditors, and such as, if carried into execution, would have the effect of defrauding them. If made in good faith, it cannot be annulled, 'although-it prove injurious to the creditors; and although made in bad faith, it cannot be rescinded, unless it operate to their injury.”
And, in article 1979:
“If the contract be onerous, and the original debtor made it with intent to defraud his creditors, but the person with whom he contracted was in good faith, the contract cannot he annulled, except under the circumstances and in the manner hereinafter provided.”
In the case of Seixas v. Citizens’ Bank of Louisiana, 38 La. Ann. 424, it is said:
“It is requisite to maintain this action that three things be shown: Fraud on the part of vendor; knowledge on the part of the vendee; and actual injury to the other creditors. C. C. 1984; [Brown v. Kenner] 3 Mart. [O. S.] 270; [Barrett v. Creditors] 4 R. 406.”
Our reasons for judgment, briefly stated, are that the evidence does not satisfy us that W. A. Tompkins was insolvent at the date of the transfer of the note by him to Albin Tompkins, to the knowledge of D. P. Batch-elor and R. W. Harkness, and that such transfer was made with the intent, on the part of W. A. Tompkins, Albin Tompkins, and R. W. Harkness, to disturb the creditors of W. A. Tompkins; that the transfer of the note to Harkness was to discharge an obligation which was due by Albin Tompkins to Harkness; that Harkness paid full value for the note; that he weiit into actual possession of the property; and that he acted1 in perfect good faith.
Batchelor and Harkness both testified on the trial to the effect that they had no in *931 formation, direct or indirect, or intimation, that W. A. Tompkins was insolvent at the time they took the note. They testified that W. A. Tompkins had the reputation of being a rich man; and they supposed that he was.
[5] There is nothing in the record going to show bad faith, or the want of good faith, in either Batchelor or Harkness. The circumstances at the time of the transfer, as described by the witnesses, are not such as to defeat Harkness’ title to the note, or deprive him of the right to have the same canceled. His title would not.be defeated by proof that, with the exercise of active vigilance, he might have discovered the existence of the allegations made by plaintiff. It must be shown that he (Harkness) acted in bad faith; that he had knowledge, or closed his eyes to facts or circumstances which would carry knowledge, of a defective title in Albin Tompkins. 2 Parsons on Bills, 272, 279; Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Bank of Pittsburgh v. Neal, 22 How. 96, 16 L. Ed. 323.
Harkness, on the evidence, must be held to have been a holder in good faith, for a valid consideration, before maturity, and that it is plaintiff’s misfortune not to have bought a valid and existing note.
The judgment appealed' from is affirmed.
See dissenting opipion of PROVOSTA, J., 84 South. 209.