[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
The defendant, E. C. Drew, appeals from a final judgment, rendered against him on the 22d of June, 1908, condemning him to pay an amount claimed by plaintiff in solido with J. E. Reynolds.
The plaintiff, Bank of Monroe, held a promissory note, averred that it was due, *Page 1030 
and prayed for judgment thereon, which was rendered, as just above stated.
In the first suit, the defendant proceeded by mandamus and asked to have the judgment canceled.
In that case which came up to us on appeal, an exception of no cause of action was filed in the district court on the ground in part that a mandamus cannot be substituted to a direct action.
The exception was maintained, and the mandamus proceeding dismissed.
This was in case No. 17,328 (State ex rel. Drew v. Myatt, 48 South. 425, 122 La. 974.
Some time after that case had been decided by this court on appeal, the Drew Investment Company brought a suit to annul the judgment.
In the suit, which was a direct action to set aside the judgment against which the writ of mandamus before mentioned had been directed, there was a trial in the district court, and judgment rendered rejecting plaintiff's demand to have the judgment in question annulled.
That case is disposed of to-day. Bank of Monroe v. Drew, 52 South. 136, post, p. 1047, handed down with other cases.
In the case just referred to — that is, case No. 17,328 — the Drew Investment Company, plaintiff, introduced the record of proceedings in the mandamus case. That record contains all the evidence admitted on the trial of the mandamus case. It contains a full statement of all the facts.
The case was heard on the merits in the district court.
E. C. Drew and J. E. Reynolds, defendants, each have appealed. The issues in each appeal are the same.
The Note Sued on and the Amount — Consideration of This Note.
The E. C. Drew Investment Company was formed about the year 1902.
For brevity's sake, we will hereafter refer *Page 1031 
to this company as the Drew Company.
Drew, Reynolds, Parker, and Blanks were the partners.
Blanks was the president, and Parker, the vice president of the Merchants' Farmers' Bank.
Subsequently this bank changed its name to that of the Bank of Monroe; and its management also changed. The Drew Company was a borrower of a large amount from the bank.
We infer that two of the members of the company being officers of the bank, they met with no great difficulty in obtaining large loans.
As usual with banks, checks and vouchers of the company were filed away by it until its accounts were made out. Accounts were rendered from time to time, and the checks and vouchers were returned to Drew, who as principal member of the partnership was authorized to receive them.
There is positive evidence that these checks and vouchers were returned to Drew personally (as he usually signed the checks of the company on the bank), and to him also accounts were rendered.
As just stated the management of the bank had changed. Evidently the new management was particular about overdue paper.
It follows, the matured paper of the company gave some concern to the cashier of the bank. He insisted upon new notes; spoke to all the partners and wrote to them.
Taking up in the first place the accounts: The former president, Blanks, swore to their correctness. The former cashier of the bank, also, and he adds that he never heard of any complaint.
C. W. Esterling, another employee of the bank, swore that he handed a statement to E. C. Drew with vouchers some time in 1906, to which Drew raised no objection.
The last cashier, Kilpatrick, testified that he made repeated demands of payment of *Page 1032 
the defendants of the amount of their indebtedness; they did not urge the least objection except Mr. Reynolds, who objected to the interest charged as excessive.
That if they suspected the least mistake in the accounts it was quite easy to correct it; the books of the bank were accessible to them. He also added that Mr. Drew said to him that if his partners were willing to sign the note he also would sign.
The note was not signed by any of the partners. After a time had passed, this cashier did not wish to leave the matter open longer. In order to place the claim in some shape, he obtained the signature of Blanks, who signed for the firm and treasurer.
The theory, on which an argument was presented by defendant, that the books were so kept as to throw dust in the eyes of the bank examiner in his rounds in examining the banks is not sustained.
We have no reason to infer that mere paper promises to pay were used to blind the examiner, and less reason to believe that in time the bank officers took possession of the paper they found under the new management which they are now attempting to collect.
That is the merest hypothesis, to which we can give no credence with the facts before us. Defendant and appellant also contend that they are not liable for the note sued on by reason of the fact that it was signed after the dissolution of the company.
There was an understanding arrived at among the members of the Drew Company in the year 1905. From that date the partnership was to go out of business.
The evidence is that it did not continue the business.
Because two of the members of the defendant company, who were officers of the bank, knew of the fact, took part in putting an end to the partnership, the contention of the defendant is that, although there was no public notice given of the dissolution, the bank *Page 1033 
must be held to have known of its dissolution.
We are of the opinion:
As a member of the firm, under the agreement of dissolution of the partnership, Blanks could acknowledge the indebtedness of an amount which the evidence shows was due. But he could go no further. He could not bind his partners to the payment of three per cent. interest in addition, as he attempted to do, nor could he bind the firm to pay 10 per cent. fee of attorney.
Blanks and Drew were authorized to liquidate the debts of the partnership. (See the testimony of Blanks later.)
The following are the facts and circumstances referred to before in matter of making the note sued on:
True, by general agreement, the partners, Drew, Blanks, Parker, and Reynolds, were not to continue the business after May 25, 1905.
Mr. Blanks testified, and in this testimony he was not contradicted:
"We were not to buy any more real estate, and it was left to Mr. Drew and myself to wind up the affairs of the company and to liquidate the debts." T. 94.
"At that meeting, it was agreed that we would liquidate the indebtedness of the company by turning our assets into money."
Blanks at that date was an officer of the bank, only in a secondary position. He was not in charge; Dr. Foresythe and Kilpatrick were president and cashier. His knowledge was not knowledge of the bank. See Seixas v. Citizens' Bank, 38 La. Ann. 424.
We should have before mentioned that no public or any other notice was ever given of the dissolution of the partnership.
The defendants rely exclusively upon the fact that Blanks, a vice president of the bank at the time (who did not have charge of its business), one of the four partners who took part in a private agreement entered into by him, Drew, Parker, and Reynolds to dissolve the partnership and to liquidate its affairs *Page 1034 
through the agency of Blanks and Drew as liquidators, was vice president, as just stated. The plaintiff bank had furnished statements to defendants, and no objection was raised thereto.
To return for a moment to the dissolution of the partnership:
At the time that the partners determined to bring its business to a close, it was agreed that the partnership would exist for the purpose of its liquidation — we have already noted.
The note given by one who had signed notes and checks for the partnership was to put an end to the overdrafts in bank and to liquidate the indebtedness by furnishing a note.
Drew, one of the defendants, for the purpose of liquidation, continued to sign checks.
Why should not Blanks sign the note to the same end? There had never been any partnership agreement signed. The power was never established by consent between the bank and its customers, the partnership
It has never been held that those who have invested their funds in a corporation can be made to lose their investment only because one or two of the investors in the corporation have knowledge of their own in a partnership of which they are members.
It is no concern of the incorporators that which the partners may have agreed among themselves.
The knowledge of one of the incorporators is not knowledge of all the incorporators.
If, as in this instance, two of the incorporators become the debtors of the corporation, they and those who act with them in the indebted partnership are not in a position to plead that they are released from payment of a note made by one of the partners, who was selected as one of the liquidators at the time of the private dissolution of the partnership, only because the liquidating partners (not at all in charge of the bank) have agreed *Page 1035 
among themselves upon a mode of dissolution.
The following is directly in point:
"Knowledge of a vice president is not knowledge to a company." 13 Hun (N. Y.) 485 (1878) Fisher v. Murdock.
"Although the president and cashier are the discount committee, and discount a note which is indorsed by the president, the bank is not charged with notice that the note was given for an illegal purpose." Graham v. Orange Co. Nat. Bank, 59 N. J. Law, 225, 35 Atl. 1053 (1896).
It must be borne in mind that it does not appear of record, that Vice President Blanks at the time had charge of the affairs of the bank.
The following is pertinent:
"It is well settled that a corporation is not chargeable with knowledge of facts merely because those facts were known to its incorporators or stockholders or clerk. But the corporation has notice of facts which come to the knowledge of its officers or agents while engaged in the business of the corporation, provided those facts pertain to that branch of the corporate business over which the particular officer or agent has some control." Cook on Corporations, vol. 2, p. 727.
Blanks at the time had no control whatever over the bank.
Notice to an agent (Blanks was in no sense an agent), but conceding that he was, there is precedent for holding that notice to an agent not in the course of his business is not notice to the corporation. Willard v. Denise, 50 N. J. Eq. 482, 26 Atl. 29, 35 Am. St. Rep. 788 (1892).
No one will seriously contend that Blanks was representing in any way the bank at the time that the private agreement of dissolution of the partnership was entered into.
Partners have always been held to the necessity of giving notice of the dissolution of the partnership.
There was no public notice given. The fact that one of the borrowers from the bank — Blanks — knew of the dissolution cannot be held as equivalent to a notice to his creditor the bank. *Page 1036 
The principle here involved was laid down in general terms in Louisiana State Bank v. Scnecal, 13 La. 525.
When one who has been an officer of a bank seeks his own advantage, and does not represent the bank (Blanks did not represent the bank when he signed the note), his knowledge is not knowledge of the bank. Richardsou, Receiver, v. Watson, 51 La. Ann. 1390, 26 South 422; Seixas v. Citizens' Bank, 38 La. Ann. 428.
In passing from this point, we will state in regard to the signature of Blanks, treasurer, that defendants did not allege in their petition that Blanks, treasurer, had no authority to sign as treasurer. The ground alleged here is that he had no authority after the dissolution of the firm (a private dissolution) on condition before stated — he had no authority to use the partnership's name.
We can only say that if he had the authority before the dissolution of the firm he had the authority after the dissolution to sign, as no notice had been given of the dissolution, and furthermore it was agreed that he and Drew were to liquidate the firm.
As relates to the onus of proof, we will state, again in passing, before leaving the said subject, under the rules of evidence, that it was for defendants to prove the affirmative of the proposition that the corporation had notice of the dissolution of the firm and not for the corporation to prove that it did not have notice.
Before proceeding further, it is necessary to note that defendants in the original answer pleaded that the note had not been duly signed by Blanks, as he, as defendants contended, had no authority.
They, none the less, thereafter pleaded that the said note had no consideration.
Plaintiff filed a motion to compel the defendants to elect whether they limited their defense to the alleged want of authorization in blanks to sign the note or whether they *Page 1037 
defended on the ground that the note was without consideration.
The district court overruled the motion in question.
Very soon thereafter, the defendants filed a motion calling upon the plaintiff to produce the account upon which the note had been made by defendant.
This was accordingly done by plaintiff, and the account is now before us. It was introduced in evidence by plaintiff, but it was produced on defendants' motion.
The evidence in regard to the account in question shows that the bank had regularly rendered accounts to its customers, including the defendant firm, who were its regular customers. That these statements were accompanied with the vouchers, all delivered to the customers.
One of the debtors to the plaintiff bank (defendant Blanks) testified:
"Q. Mr. Blanks, what, if any, objection was there at any time that you ever heard before the answers filed in this case to your signing notes for overdrafts of the E. C. Drew Investment Company, or other obligations due by the Company?
"A. There was never any objection at all, never any complaint made by any member at all.
"Q. What was done with the notes and checks given by the Drew Investment Company to and drawn on the Merchants' Farmers' Bank?
"A. They were delivered when the accounts were rendered?
"A. Yes, sir; as near as I can testify, the accounts were surrendered very frequently, and I could not say that every time I knew that they were handed or given to Mr. Drew, but I can say that a very large percentage of the times the checks and vouchers were handed to Mr. Drew.
"A. No, I have never heard of any complaint from any member of the E. C. Drew Investment Company as to the accounts except that at one writing they thought the interest excessive. The books will show this.
"Q. Prior to the filing of this account, on December 27th last, state whether or not there was any conversation between yourself, Mr. Reynolds, and Mr. Drew, or either of them between the date of this demand and May 25, 1907, relative to the adjustment of this matter.
"A. Yes, sir; several conversations. Of course. I don't remember the exact dates, but they were between May and December. *Page 1038 
"Q. You and Mr. Reynolds?
"A. Drew and Reynolds and Parker and the just named Reynolds and Parker and myself several times.
"Q. During any of these conversations, what denial, if any, was made to the correctness of the amount as evidenced by this note?
"A. There was never any to the amount.
"Q. What denial, if any. did they make to your authority as a member to give this note in settlement of this account?
"A. None at all, Mr. Theus, none in the world. There was no complaint made so far as I was concerned.
"Q. What I want to know especially, Mr. Blanks, is what denial, if any, either of these gentlemen made as to your authority as a member of the partnership to execute this note.
"A. There was never any objection at all to my doing it. I think I had their perfect confidence, and there was never any objection received about my doing it one way or the other."
Now with reference to his being the treasurer of the company this witness swears:
"Q. Mr. Blanks, I notice that you signed this note as treasurer of the E. C. Drew Investment Company. When were you treasurer of that company?
"A. Well, Mr. Sholars, when the company first went into business it was generally understood that Mr. Drew was to have the general management and I should be the treasurer, and the account should be with the Merchants' Farmers' Bank. It was just in a general way. There never was any document drawn up to that effect."
The next witness, who was the cashier of the bank and assisted in keeping the books, swore to the correctness of the books.
True, under the cross-examination, the witness, we infer, was confused, but not to the extent of discrediting the account.
Other witnesses, officers and employees of the bank, testified and sustained the correctness of the account.
We have the testimony of Blanks, debtor, as to its correctness.
Croyier, cashier, in the first place stated:
"Q. Mr. Croyier, you say the account is correct?
"A. To the best of my knowledge."
Kilpatrick, president, at the time cashier, says that the account taken from the book is correct to a cent. *Page 1039 
 In Concluding.
1st. The settlement in the nature of things, between the bank and its customers, must have some decisive effect. The bank surrenders its vouchers to the customers, and within reasonable time he ought to report his complaint to the bank if he has any cause.
No objection was urged by defendant before the suit was filed.
The defendants were members of a partnership. Its assets were large. They surely kept books as memoranda of some kind.
Is it possible that a business partnership composed of business men, permitted such an asserted mistake without the least timely objection?
In testifying they did not seek to prove discrepancy such as that argued.
The statement filed by defendant relied upon is not a continuing or connected account with the regular statement; it is at once discredited by failure to include one item of an amount of $17,000 admitted incorrect — a rather large amount overlooked, too large to inspire confidence in the account.
The regular statement of the bank furnished is of debits and credits. It is a succinct account. It contains all the items. Not one was pointed out by defendants as erroneous.
We agree with the district judge that plaintiff is entitled to the amount claimed.
 The Partnership.
Whether the partnership was ordinary or commercial presents the next issue before us for decision.
Defendants' contention is that it was an ordinary partnership.
The plaintiff concedes the force of the argument of defendants in support of their contention in this particular.
We must say that the plaintiff is only mildly insistent upon this subject.
It was stated that the defendant firm sold trees which they had cut on their own lands. *Page 1040 
It appears that it was one transaction.
Preparing an article for the market that forms part of the realty owned, and afterwards selling it, does not have the effect of changing an ordinary partnership into a commercial partnership, particularly if it consists of one act during a short period in many years of the existence of a partnership.
One transaction of a commercial character may perhaps be considered the act of a commercial partnership quoad the transaction; but it does not have the effect of changing an ordinary partnership into a commercial partnership.
Even planting corporations sometimes engage in transactions of a commercial nature in connection with their planting without creating the least impression of a change in the purpose of the partnership.
It follows that those who deal in lands, buy standing timber and sell it under the facts and circumstances before mentioned are not commercial partners. The buying of immovable and the sale of trees thereon was an incident in the business of the partnership.
True, a partnership engaged in buying and selling logs is a commercial partnership, and the partners are bound in solido, but that provision of the law has no application here, for the partnership cannot be considered as having engaged in such business. The one transaction before mentioned cannot render the partners liable for each other's acts in matter of the object for which the partnership was formed.
 The Judgment from which the Defendants Appealed.
Having decided that the amount of the judgment is due, and that the members of the partnership of Drew Co. are bound jointly, we take up, in the next place the grounds urged against the legality of the judgment. They are that time was granted *Page 1041 
after the judgment had been rendered, and that the nonsuit entered could not be allowed after the judgment had been rendered.
A nonsuit was entered as to J. P. Parker and R. B. Blanks, two of the members of the defendant partnership, after the judge had announced his judgment in open court but before the judgment had been signed.
The following is the entry in the minutes: June 20, 1908, judgment rendered in favor of plaintiff. (See decree.)
"Judgment read and signed June 22, 1908. On motion of plaintiff's counsel, nonsuit is entered as to J. P. Parker and R. B. Blanks; judgment against defendants."
Manifestly, the usual order was granted on the first day, and an order was given to write the judgment.
It was signed on the 22d, before the nonsuit was entered.
The contention of defendant is that the judgment was fraudulently obtained.
This is not sustained in any way.
The facts as to the nonsuit are:
An agreement was entered into between the bank and Blanks and Parker in accordance with which the nonsuit was allowed.
In this agreement Blanks and Parker admitted the amount claimed, but stated that:
"Owing to the financial conditions at the time, they were unable to pay, and therefore arranged with plaintiff for an extension of time, and they thereby avoided incumbering their property with a judicial mortgage, that it was entered into without prejudice to the rights of the plaintiff bank to institute and maintain a future action for the recovery of the indebtedness sued for in said action." (Excerpt from the agreement in accordance with which the nonsuit was entered.)
In the judgment appealed from, the court rendered judgment for the amount claimed against defendant Drew, less costs and fee of attorney, and reserved the right of plaintiff to sue the defendants Blanks and Parker.
The appellee joined in the appeal, and in this court moved to have the judgment amended by reading the interest from 5 to 8 (difference) per cent. and the fee of attorney. *Page 1042 
The judgment appealed from is amended by changing it from a judgment in solido against the defendants to one jointly due by them.
It is therefore ordered, adjudged, and decreed that the judgment appealed from is amended by condemning the defendants John E. Reynolds and E. C. Drew, jointly, to pay the amount of the indebtedness found by the district court, each one-fourth.
It is further ordered, adjudged, and decreed that as amended, and after canceling the words "in solido," the judgment is affirmed.
Plaintiff and appellee to pay the costs of appeal.
 On Rehearing.
MONROE, J. A rehearing was granted in this case because the court doubted whether, upon the facts presented, two former members of an ordinary partnership, that had been dissolved, should be held liable on a note issued in the name of the firm, by another former member, and without their knowledge; and a re-examination of the record has converted the doubt into a conviction that they cannot be so held.
The facts are as follows: The E. C. Drew Investment Company was an ordinary partnership, composed of Drew, Blanks, Parker, and Reynolds, and it kept its account for a number of years in the Merchants' 
Farmers' Bank, of which Blanks was president and Parker vice president. Drew, in general, managed the business — drawing checks, making notes, attending to affairs in the office, etc. — but Blanks took part, more or less, in transactions with the bank, though to what extent the record does not inform us. It was, however, perhaps, due to his influence that the account of the firm was generally overdrawn. On October 23, 1907, the firm was dissolved, by consent; the understanding of the parties being that Drew and Blanks were to convert the assets into money as rapidly *Page 1043 
as they could, and apply the proceeds to the payment of the debt, in the form of an overdraft, due the bank, and, in the meanwhile, that Drew was to pay, from the funds collected, or, possibly, by checks against the overdrawn account, some outstanding debts. amounting to less than $500, and the expense of an office, as, also, a small salary to himself — the employees of the firm being discharged. It was well understood that no obligations were to be created in the line of business save when necessary to make a sale, and it is not asserted that any obligations of that kind were created. Some 16 or 17 months after the dissolution, some other banking concern bought a majority of the stock of the Merchants' Farmers' Bank, changed the name to that of Bank of Monroe, and placed it under different control; Blanks, however, retaining some stock and being made vice president, and Parker (also retaining some stock) being made a director. In selling his stock (or the greater part of it) to the new concern, Blanks appears to have guaranteed some of the accounts and, among them, that of the E. C. Drew Investment Company (guaranteed to the extent 55 per cent.), and the new cashier, who afterwards became president of the bank, began at once trying to reduce them to something definite and tangible. In that situation, Blanks executed the note here sued on, by way of liquidating the overdraft account of the Drew Company, signing it, "The E. C. Investment Company, by R. B. Blanks, Treas." He could hardly have been the treasurer of the company, at any time, for there was only an ordinary partnership, and, even if he had held such a position, the bank had no reason to suppose, so far as we can see, that a treasurer would have authority to make notes in the name of the company by which he was employed. It is not asserted, or pretended, that either Drew or Reynolds, the defendants now before the court, authorized the *Page 1044 
giving of the note, or knew anything about it until this suit was brought. On the contrary, the president of the bank, after the note was given, endeavored to get them to give notes in settlement of what he referred to as the account or overdraft, and Drew expressed his willingness to join his former partners in such a note, but Reynolds declined to give a note of any kind.
Civ. Code, art. 2872, referring to ordinary partners, provides:
"Art. 2872. * * * And no one of them can bind his partners, unless they have given him power so to do, either special or by the articles of partnership"
And, in regard to the authority of a partner, after the dissolution of the partnership, this court has said:
"The partner's power to bind his copartners, by note or acknowledgment, or to use the social name, ceases with dissolution. Any subsequent power is derived, not from previous relations of the parties, as partners, but from a new contract, one of mandate." Meyer-Weis Co. v. Atkins, 29 La. Ann. 586.
"After the termination of a partnership, no admission or acknowledgment, by one of the partners, of the correctness of an account, made before the dissolution of the partnership, is legal evidence against the other members of the firm." Conery v. Hayes, 19 La. Ann. 325.
"After the dissolution of the partnership, neither partner has authority, without special mandate so to do, to bind his former partners, either in the renewal of a partnership debt, the imposition of a new obligation on it, or to in any manner vary the form or character of the obligation already existing." Dodd, Brown Co. v. Bishop, 30 La. Ann. 1180. See, also, Vancleave v. Nelson, 49 La. Ann. 621, 21 South. 734.
Counsel for plaintiff say that the note was given to close an account; that the account is in the record; and that, if plaintiff is not entitled to judgment on the note, it ought to have judgment on the account. The account is in the record, however, in spite of defendants' objection that there is no allegation of the petition authorizing its admission, which appears to us to have been well taken, since this is a suit on the note, and not on the account. Another objection was that the correctness *Page 1045 
of the account had not been shown, which also appears to have been well taken, since defendant produced a statement of the account of the Drew Company, made by the cashier, at the time, of the Merchants' Farmers' Bank, showing that between January 14, 1904, and April 26, 1905, the firm was debited with $42,660.92, whereas in the statement of account filed by plaintiff the amount debited during that period is $94,804.63, a difference of over $50,000. Being asked whether he was able to explain the discrepancy, the witness answered that he was not. So far, therefore, from its being shown that the account is correct, it seems to us to be affirmatively shown to be incorrect. Defendant's next contention is that the acts of the Drew Company did not constitute a dissolution of the partnership, and, if they did, that no notice was given to the bank, and that the members of the firm continued to be liable for what was done in the firm's name. We find no conflict in the evidence on the subject of the dissolution of the firm. There were four partners; they were all present; and the three who have testified say that they agreed to dissolve, and did dissolve.
There is no evidence to the contrary; and we think the dissolution is established. The question how far the defendant may be liable for other notes, made in the name of the firm, between October 23, 1905, and May 25, 1907, is not just now before us for decision. During that period however, Blanks, a member of the dissolved firm was president of the bank, and Parker, another member, was vice president, and, when a month or two after the bank had passed into the hands of the present owners the note here sued on was made, Blanks was vice president of the bank, and Parker a member of the board of directors. Mr. Kilpatrick, who was president of the bank when the case was tried, and had been its cashier since the date of its *Page 1046 
reorganization, does not intimate, in his testimony, that he did not know of the dissolution of the firm. He does say that Blanks gave the note at his request, and that Parker was informed of the giving, but that for some reason, not explained, Drew and Reynolds were not informed, and that during several months after the note had been given he endeavored to get them to close the "account, or overdraft," as he continued to call the debt, by giving their notes, or in some other way. If, however, he had considered that the note given by Blanks was the note of the firm, bound all its members, and closed its account, it appears to us that he put himself to a good deal of unnecessary trouble, and, as his testimony proves the contrary, we will not impute to him such lack of intelligence, but will rather assume that he was aware that the note held by the bank was of no value, so far as the former partners, other than Blanks, who had signed it, were concerned.
The third, and last contention of the learned counsel for the bank is that conceding that the firm was dissolved, and that the bank knew it, the note was still good, because Blanks was authorized to make it, in his capacity as liquidator. We think not. He had no other authority, as liquidator, than such as was conferred on him, expressly or impliedly, by his copartners, and that did not include the authority to bind them by the giving of a note.
For the reasons thus given we are of opinion that plaintiff can take nothing by this suit.
It is therefore ordered, adjudged, and decreed that the decree heretofore rendered in this case be set aside; that the judgment appealed from be annulled, avoided, and reversed; and that there now be judgment in favor of defendant Emanuel C. Drew, and against the plaintiff, Bank of Monroe, rejecting *Page 1047 
the demand of the bank and dismissing this suit, at its cost, in both courts, without prejudice, however, to its right to bring suit against defendant on the account or overdraft of the E. C. Drew Investment Company.
BREAUX, C. J., dissents.
 *Page 861